BROOKE, Judge.
When this case was before decided I gave a silent assent to the decree of the Chancellor, because I did not perceive that there was any difference of opinion in the court on the principles, which were to govern it; from the very able opinion of the dissenting Judge, I have not been able to deduce a different conclusion. After the utmost attention to the argument, which has since been submitted to the court, and the most deliberate reflection on the cases adduced, I have not seen cause, in any material degree, to change my first impressions. The facts charged in the bill are as follows: it is alleged that Holloway and Hanserd, being much pressed for money applied to the defendant Bruce for a loan of §3603 78 which they obtained at the usurious interest of 2j4 per cent, per month, and executed their notes for $1400 each, negotiable *at the Bank of Virginia, with John Allison as indorser—the first note payable in six months, the second in nine months, and the third in twelve months after date; that the first and second notes were paid at maturity; and the third lodged in the bank; that afterward, the said Holloway and Hanserd, being in increased distress applied for a second loan which they obtained at more exorbitant interest, from 20 to 25 per cent, and executed two other notes, with Thomas Atkinson as indorser, payable at nine and ten months, negotiable at bank, which are also deposited in bank for payment: that Hanserd, the surviving partner of the firm, will not avail himself of the act against usury lest it should injure his credit, and that if the notes are paid out of the company subject, it will be ruinous to the estate of Holloway and prejudical to his creditors. To these allegations the defendant Bruce answered ; he denies any knowledge of any communication for a loan, admits that he purchased the notes of Mer-tens the broker, at the discount stated, insists that it was a fair purchase without any particular knowledge of the circumstances of Holloway and Hanserd, or that the broker was their agent; that notes of persons of unquestionable solidit3' might have been purchased at a greater discount. To this answer an exception was taken, on the ground, that it was not sufficiently explicit as to the defendant Bruce’s knowledge of the agency of Mertens the broker. In his second answer, he avers, that he did not recollect or believe that Mertens informed him, that he was the broker or agent of Holloway and Hanserd, or of either of them, or that he had received information to that effect from any other person. Whether this last answer was sufficient or not, it is not material to discuss, as no exception is taken to it; there is certainly an appearance of caution in it which deducts from it somewhat, the credit, that otherwise would have been due to it; had the plaintiff insisted on a discovery in his bill, he ought to have excepted, and he might have extorted *from the defendant a more direct and full answer; in the shape which he has given to it he might, if not satisfied, have again excepted; and the defendant would have then had the opportunity of shewing if he could, that in effect his answer was as full as a more elaborate statement of the circumstances could have made it: but the plaintiff took issue on it and relies on the evidence of Mertens, the broker, and of Haxall and others, which last is not material, to support the charges in his bill: if they are proved there can be no doubt of the usury. The objection by the counsel for the defendant, that the al-legata in the bill do not agree with the probata, will be found upon examination, not to be of importance: the difference between a direct communication between Holloway and Hanserd and the defendant Bruce, and an indirect one through Mertens, if proved to be their agent, will not be material ; Mertens’ testimony is most essential, *816 and if it is not as full as it might have been, the plaintiff had the power to make it so by a more minute and precise examination of him. He proves, I think, that he was a general broker in Petersburg, in which place the parties, except the defendant, Bruce, resided; that he was in the practice, as broker, of selling for those pressed for money, bills, notes, &c. and that he had frequently sold notes for H. & H., and that knowing the defendant Bruce purchased paper, he applied to him to purchase the first notes, described in the bill of the complainant, for the purpose of seeing whether he would give more for them than had been offered by others; that he purchased them at the price stated; that afterward he applied to him to purchase the second set of notes mentioned, and that he also purchased them at the discount stated in the bill, a discount not greater than was given for as good paper as any in the town : paying by a draft on Marx & Co. of Richmond; that he considered these transactions as sales commonly, made of bonds and notes at a discount, and not as transactions between a broker *and a person leaving money in his hands to share with; that he made it a rule to make no communications to a person purchasing; that it was generally supposed, that the drawers were in distress for money, but did not know that Bruce had any particular knowledge of it; that the in-dorsers of the notes were considered to be in good credit, &c. Haxall says it was generallj' understood in Petersburg, that the drawers were distressed for money, that the defendant Bruce was well acquainted with them. The other testimony adds same particular instances in which he had purchased or discounted paper at a premium. The first question upon the testimony, I think, is, was the defendant Bruce informed that he was dealing with H. & H. for the notes in question, or had he such knowledge of the real transaction, as to subject him to the charge of a corrupt intention to violate the act against usury?. My own impression is, that though he may have known the fact, that the notes were the property of the drawers, yet it is not so proved as to convict him of the charge. Upon the evidence, the notes might have belonged to others who had received them for value, and preferred selling them, and waiting until they came to maturity. Direct proof, I admit, is not required in these cases, but the inference ought to be as strong, as would be required to convict a party of the breach of a penal law in other cases. His knowledge that the drawers were pressed for money, if directly proved, does not produce the necessary inference that the notes were known to be their property; his knowledge of the high credit of the indorsers, if it had been fixed on him by the testimony, would repel the idea that the notes were sold for their benefit; but, yet, the testimony of Mertens shews, that he often sold notes and bills for the benefit of persons, whose names were not on them; it would be, I think, hazardous to pronounce, that the defendant Bruce knew that the notes in question were not notes of that description, that ought at least to be satisfactorily shewn. If it *were proved that he knew the in-dorsers were not pressed for money, the inference would be a more direct one, that he knew they belonged to the drawers, and that in dealing with Mertens the broker, he was dealing with their agent: If I could come to this conclusion, I should have no doubt of the usury, but not being able to fix upon the defendant Bruce the intention to commit usurjq I shall proceed to consider the cases that have been relied on, some of which have been supposed to subject him to the consequences of committing usury. In the absence of testimony that he intends to do so, the case from 1 Raymond cited by Mr. Call shews, that a bill may be sold without indorsement, and that the doctrine sanctioned in this court is. not new in the case of Gibson and Rristoe. Mr. Pendleton said that in a mere sale of property, and bonds are, in this respect, as much property as any thing else, altho’ at an under value, it is not usury here, because price is a thing unfixt, and depends upon the convenience of the contracting parties; that bills and notes are as much so I presume will not be disputed. Judge Roane in the case of Price v. Campbell, said, that in cases of this kind we are at liberty to infer usury from the circumstances of the transaction; but in making this inference, we are confined to the inquiry whether there is a corrupt contract or agreement for usurious interest. No inference can be drawn from these cases, that an opinion was entertained by the Judges, that usury might be committed without proof of a corrupt agreement or contract in violation of the statute. These cases upon authority legalise a bona fide sale of bonds and bills —and notes stand on the same footing, nor are any of the cases cited to the contrary- — - whether contracts for the purchase of bills, bonds, or notes are a colour or pretence for an usurious loan, or a fair and honest transaction, is always to be decided by their circumstances. See Cowper’s Rep. 12 and ?70; Doug. *708 and 3 Term Rep. (c) If a fair purchase, no matter what the discount, it is not usury. All the cases seem to proceed on this idea, and upon examination, I think it will be found, that there is no case in which a party, not participating in the corrupt concoction of the contract, has been deemed a usurer: that the statute against usury will protect a party to an usurious contract though ignorant of the usury is not denied; but that under such circumstances it will subject the party to the consequences of committing usury is no where decided. In the case of Ackland v. Pierce, 2 Camp. 559, He Blanck, Judge, said, it was not material that the drawer of the bill, Prince, was ignorant of the usury which was between Waine the acceptor, and one White who discounted it. In that case, if I understand it, had the bill been a perfect bill before the usurious agreement between Waine and White to discount it, it would have been a valid bill; it was the corrupt agreement to discount it at a greater than legal interest, in the inception of the contract itself, that made it usurious; it was a shift to evade the statute. *817 Thus Lord Kenyon held in the case of Parke v. JBleason and others, (d) that a bill legal in its inception, indorsed by A. to B. for an usurious consideration, and by B. to C. without notice of the usury, and afterwards paid by C. to the assignees of B. who was bankrupt, though void as between A. and B. was valid in the hands of the assignees, who were clothed with the rights of C. the innocent indorsee Whether the notes in the present case were legal in the inception will be noticed hereafter; a contract usurious in its inception cannot be rendered valid altho’ in the hands of an innocent indorsee without notice :(e) but on the contrary if it be originally fair and not usurious, no intermediate usury can affect it in the hands of a bona fide holder, (f) These last cases are referred to not *as authorities, but because they were cited by the counsel, and conform to the English decisions. The principle seems to be settled, that whether on the one hand, even a, bona fide holder of a bill must lose his remedy if there be usury in the concoction or inception of the bill except as against the party to whom he paid value, on the other if the contract be fair between the original parties to it and no usury in that contract, it will be valid in the hands of a bona fide purchaser, though at a greater than legal interest. The latter conclusion follows, from the settled law that a note may be sold. If the notes in the present case were tainted with the usury in their inception; if there was a corrupt agreement between H. and H. and the in-dorsers, Bruce must lose his debt as against the drawers; and if also, he had participated in that agreement, or had knowledge of it, he would be condemned as a usurer. None of the cases cited go farther: in the case in 1 Camp. 141, much relied on, King, the broker agreed with the acceptor to get the bills discounted at 40 per cent, the arrangement was made before the bills were accepted, it was a device to evade the statute: if Bruce had discounted the notes at legal interest, there could have been no pretence that they were usurious; was he a party to any agreement that they should be discounted at a higher rate; was he apprised that they were made so to be discounted, or that they were the bills of the drawers, from which to have inferred that fact. In the case of Hamilton v. Le Grange, (g) it is said by Justice Eyre, that in construing any particular circumstances in order to found a conclusion of fact, especially in cases in which usury is alleged, we ought to deal with those circumstances according to the common sense of mankind. Pursuing the rule, the circumstances detailed by the broker, cannot lead us to any certain conclusion, that Bruce knew the notes to have been made for sale and ^certainly not to the conclusion, that he was a party to the making of the notes for that object. As before remarked, Mertens expressly states, that he was in the practice of selling notes also of a different description; notes as I understand not made for sale, but real business notes which were not indorsed by the owner. Bruce was in the trade of buying paper, and it appears, gave for the notes in question, what the best paper free from the taint of usury sold for. It is impossible to infer from these circumstances, that he meant to practice usury in this case. However careless about the violation of law, he would not without an adequate motive hazard the loss of his money. In the case of Hansborough v. Baylor, though not fully reported, it must, I think, be admitted that the ignorance of the latter of the transaction between the former and Rootes, was the real ground on which it was decided, that the purchase of the bond by Hansborough was not usurious; the bond was made to be sold at usurious interest. Judge Tucker says, that whatever even Baylor’s intentions were, Hansborough was ignorant of them; and though the former might even have intended to borrow upon usury, the latter seems only to have intended to make a fair purchase. The case in 3 Johnson (Wilkie v. Roosevelt) is not in conflict with this case; the purchaser was apprised of the object for which the bill was made, and though Wilkie was a bona fide holder, he could not recover as against the makers. There was usury in the concoction of the note, in which those under whom he claimed participated. — ■ Marx & Co. made a note to the defendant which he indorsed- — the Company then sent it to Goodrich a broker, who received it at 334 per cent, discount, and in discharge of a debt due by the drawers to him and indorsed it to the plaintiff. The case in 2 Johns. Jones v. Hake is of the same character; the general remark by one of the Judges that a note made to be discounted at illegal interest, is usurious, in the hands of a bona fide holder, is ~to be taken in relation to the actual case before the court. It applies to cases in which, as in the preceding, the purchaser of the bill was a party to the agreement or knew of the purpose for which the bill was made. In IS Johns. Mun v. the commission company, it was decided that a bill valid in its inception is valid in the hands of an innocent indorsee though discounted at a higher rate than the legal interest. In Bennet v. Smith and Phelps, it was said that a bill was waste paper until discounted, if nothing was due from the drawer to the payee, but I understand it to be law, that a party who indorses a bill for another makes him his debtor to the amount, because of his responsibility to pay. In the present case it could not be insisted on by the drawers that they were not indebted to the indorsers. If the notes had been discounted in bank, or Bruce had discounted them at legal interest, such a pretence could not have been set up. The want of actual consideration between the drawers and indorsers is not material, after the bill has gone into the hands of one who has paid value for it, even though a fraud be committed by the indorser in the bill: yet this court held in the case of Williamson v. Robertson that the drawer was liable upon the principle, that he who trusts most, must be the loser in a controversy with a *818 party who gave value lor the bill without any knowledge of the fraud.
I have not noticed Mr. Call’s second point, because I am of opinion it does not arise here; whether Bruce can recover more than he paid for the notes is a question which may be decided at law, and it is not alleged in the bill that Hanserd the surviving partner will not avail himself of any other de-fence, except the plea of usury; upon the whole, I am still of opinion, that the Chancellor’s decree is correct and ought to be affirmed.
ROANE, Judge.
This is a bill brought by the appellant, as administrator of E. B. Holloway deceased, *against the appellee and others. It charges, that the late house of Holloway and Hanserd, of which the appellant’s intestate was a member, being greatly pressed for money, became a prey to usurers and that, among others, they applied, on the 14th April 1811, to the appellee, who was apprised of their situation, for the loan of $3603 78, which they obtained from him, at the usurious and unconscionable interest of 1%, per cent, per month, and to cover which loan, they executed three notes for 1400 dollars each, with John Allison Esqr. as indorser, payable at six, nine and twelve months, respectively, as by a memorandum in the hand writing of the said intestate, and referred to as part of the bill, appeared. The bill makes a precisely similar charge in relation to another sum obtained on the 10th October 1811, at the still.- more exorbitant interest, as is alleged, of from 20 to 25 per cent, per annum: the said house, as is further charged being then in increased difficulties, and that this was known to the appellee; and to cover which loan, notes were given, with Thomas Atkinson Esqr. as indorser, payable at nine and ten months respectively after date.
The bill prays “that the appellees may full answer make to the premises;” and again, it prays generally that the appellee may set forth “all that he knows respecting the premises.”
To the important allegations of the bill respecting the pecuniary distresses of the house in question, the appellee makes no other answer, than that he had no particular information as to their circumstances. By this form of expression he endeavoured to evade the interrogatories aforesaid; although it is proved in the cause, that he must have been conusant of the general notoriety which prevailed, in relation to those distresses. To so much of the bill as charges in substance, by (referring to the memorandum above mentioned), that Mer-tens, who is therein named, was the agent of Holloway and Hanserd, *in the transaction aforesaid, the appellee only responds, in his original answer, after admitting that the negotiation was effected with him; that the question, whether he was their agent or not, was one with which he had nothing to do. And when pressed by the exception of the appellant for a more explicit answer on this point, he still only states, in his amended answer, that he does hot recollect or believe, that Mertens informed him, that he was their agent, nor that he received information from any other quarter: all of which may be strictly true, and yet the appellee may have undoubtedly considered Mertens as their agent in that transaction: he must have so considered him from the combined circumstances hereafter more particularly stated, and, especially, from the facts that Mertens was the known agent or broker for others, and seldom or never traded in paper of his own. To so much of the bill, as charges the transaction to have been a loan, covered by the notes in question, the appel-lee, after using the common slang (if I may use so common an expression), respecting the legality and even morality of purchasing notes, at ever so enormous a rate of discount, only says, that it was a fair purchase of the notes, and not a loan; whereas the receipt from a man of his own notes, payable at a future day, in consideration of monej' advanced, is only a loan evidenced by a note and not a purchase; and whether it is a .loan or a purchase, is, besides, an inference of law, which the party is not competent to swear to. Again: the appellee says in his answer, that no communication for a loan ever passed between H. & H. and him. This may be true, and yet such communication may 'have passed from their agent: and, also, this assertion may be bottomed upon the erroneous supposition first ‘Stated, that the obtaining from a man his own note, for money advanced to him, is a purchase of the note and not a loan of money. Besides, there may well be a loan, without any formal communication therefor. A *receipt by one man of 101. and a promise to pay 201. therefor, at the end of the year, without more being said, or passing between the parties, is to all intents and purposes, a loan. Words in this case are not necessary: in the language of the books res ipsa loquitur. A formal communication for a loan is only necessary to be shewn, when a transaction has the form of a sale or the like, and the device is to be detected by shewing the real cause which brought the parties together. (Ord on Usury, 74; 1 Call 62, Gibson and Eristoe.)
By these and such like equivocations, prevarications, and mental reservations, the appellee has sought to shelter himself, from the consequences of a full and frank answer to the charges contained in the bill. While I do not say that these equivocations operate an admission of the truth of the facts to which they relate, they on the contrary oppose no certain and positive denial to those facts. They give a character also to the answer which is very unfavorable to it, even in relation to such parts as would, otherwise be free from objection. The spirit of the maxim “falsum in uno, falsum in omnibus,” forcibly applies to it, and disparages the whole answer. At the same time, I must claim the right to say, that if this answer were one of the purest model, I do not know that its matter would at all v?.ry my Conclusion upon the subject.
The case made by the bill, is, that of an usurious loan of money, covered by the notes in question: and the ground taken by the answer, is, only, that the transaction was a purchase of the notes. The answer however does not state, that the appellee purchased *819 them from Mertens, (the broker,) from the respective indorsers of them, or from any other person, being the actual owner of the said notes. The answer could not have taken this ground, as is abundantly shewn by the testimony. The question we are called upon to decide is, therefore, whether a note which has never been consummated in favor *of another person, for a valuable consideration, nor is purchased from that other, but receives its existence for the first time, in consequence of a usurious transaction, of which it forms a part, and which is only given by the drawer at the time of that transaction, and as an evidence of the contract, is free from the objection of usury? The question more particularly is, whether a contract which is manifestly usurious in itself, ceases to be so, in consequence of the borrower’s putting in the hands of the lender, for the more easy proof of the promise, a writing, evidencing the existence of that promise?
This is the true question before us, upon this record. I shall therefore steer entirely clear of the question, whether a man owning the bona fide note of another, has a right to sell the same, at an usurious rate of discount. This question has been affirmatively settled, and I do not mean to go into it, at this time: but I am authorised to say, that even a transaction having the form of the sale of such a note, may be set aside, as a device to elude the act of usury by showing, that the purpose of borrowing and lending brought the parties together. This was decided in the aforesaid case of ■Gibson and Pristoe: and ths doctrine applies a fortiori to the case of a transfer of a man’s own note.
That the notes in question in this case were of the latter character and not of the former, is undoubtedly inferable from the circumstances, and is positively proved by the testimony. Of this fact the appellee could not have been ignorant: but it is entirely unimportant whether he were so or not, if in fact, such was the nature of the transaction. I will first shew what are the circumstances which go to establish this fact, and then refer to the positive testimony.
In considering the circumstances which warranted a presumption that these were the notes of H. & H., and of none other, and therefore, were neither consummated before this transaction, nor free from the objection of *usury> it is objected in the present place, that usury is not to be presumed, ■ I admit that there is no testimony: but, it is most clear, that usury may be presumed from the circumstances, where they are sufficiently strong; and it would be strange indeed if it were not so, when even the crime of treason or murder may be inferred from circumstances. We are told in Ord on usury, (h) that circumstances are to be relied on to prove a contract to be merely a shift to evade the provision of the statute: Again, it is said, (i) that many circumstance weigh in questions of usury, and that the courts formed their decisions upon all the circumstances of each case, without saying what weight any single circumstance would have. This is not only the established doctrine on this subject, but the same author has given us an enumeration of the circumstances most usually relied on in such cases: as for example the slightness of the hazard, the inadequacy of the price, and the distresses of the party, (k) Their distresses are proved to have existed in this case, and are always important in giving a character to the transaction. They compel the borrower to enter into the usurious contract: he is no longer considered particeps crim-inis in the transaction ;(l) he is scarcely a free agent, and is held to be in the emphatical language of the books, “a slave to the lender.”(m)
That circumstances are to be resorted to in cases of this description results from necessity, and from the fact that they are often the only evidence to be expected. In 4 Hening’s Statutes at large (n) it is said, “that usurious contracts are always made in secret, and with such caution, that they can seldom be detected in the ordinary course of evidence;” and hence a bill for their discovery has been provided. In the case before us we cannot expect positive evidence. We cannot expect the ap-pellee *'to say that he was informed, that the notes were the property of the makers, and not of the broker or in-dorsers ; for that vi'as a fact about which he asked no question, lest it might be affirmatively discovered, and afterwards rise up in judgment against him. We cannot expect to show that the borrower obtruded this testimony upon him, because, for the same reason that would have broken up the treaty. We cannot expect the broker will volunteer this information to the usurer: he knew his interest too well, and he now tells us that it was his practice never to let the lender know who the borrower was. Nor are we to expect this information from other witnesses: they are sedulously kept out of the way in such transactions. Unless, therefore, we resort to circumstances, we may get no testimonj' whatever, and had as well, at once repeal the statute.
If circumstances are permitted to operate, those existing in this case abundantly shew, that H. .& H. were the borrowers, and neither Mertens, (the broker,) nor neither of the endorsers of the notes in question; and that this must have been known, without the possibility of doubt to the appellee. It is proved in the cause, that the appellee was well acquainted with the circumstances of the mercantile houses in Petersburg, and that he must have known that H. & H. were much distressed for money. On the contrary, it is ghewn, that both of the indorsers were in easy circumstances, and one of them, at least, very wealthy, and even himself, a money lender: and as for Mertens, he not only acted as a broker, but he tells us, expressly, that as he acted as a broker, the appellee could not welt suppose, that the notes were sold on his own account. Is it possible from these *820 facts, from others for which I refer, particularly, to the record, and from the relation, circumstances and situation of the parties, that the appellee could have doubted, for a moment, that it was H. & H., and not the other parties who were making this ruinous sacrifice? It is not; nor *is it even pretended by the appellee himself. The notes, in question, so far from being shewn to have been the property of the in-dorsers, are not shown to have been even in their possession: and as to Mertens, when they were in his possession, it was as agent for H. & H., and for the single purpose of being discounted for an illegal premium.
But we are not compelled to rely on circumstances, only, as to the ownership of the notes in question. Mertens, himself, proves (and he is both a competent witness, and his deposition is made evidencé in the cause, by. consent), that all these notes were put into his hands by Holloway. No ownership by any other person is even pretended. H. & H. were, therefore, the owners of the notes, or rather of the blank paper, at the time and this was well known to the appellee. This knowledge, however, is quite unimportant, if the fact be so, as the cases to be presently cited unquestionably prove. Every argument which goes to shew that an innocent indorsee of a note given on an usurious consideration, without his knowledge of the usury, will be bound thereby, holds a fortiori as to a party to the transaction. We cannot in general suppose him ignorant of the real character of the transaction. The proof of such knowledge would be, in most cases, impossible; and to require it would operate a repeal, pro tanto of the act of usury.
If then it is settled,, in this case, that H. & H. were the real owners of these notes, or of this paper, at the time of the negotiation, and no other person; and, much more, if that fact was known, as it unquestionably was, to the appellee, the case is brought to a simple point. In that view it was not a consummated and bona fide note of another, which was sold by the owner, and which in its origin and consummation was free from the taint of usury, but it was a blank piece of paper, which as an effective note, was coeval with, and only ushered into existence by the usurious contract, and was only delivered *to the appellee as an evidence of that contract. In that view, also, it was, in relation to the indorsers, only an accommodation note. Although their names were on them, they paid no consideration therefor, had no interest therein, nor possession thereof, and could bring no suit upon them. The first person who paid a consideration therefor, was the appellee, and he is the first person who, but for the usurious consideration, could have maintained an action upon them. The names of the indor,sers being only added thereto, as a further security, they could neither bring any suit upon them, independently of the usury, nor assign them to any person having notice of their real character. All this was decided by this court in the case of Norvel v. Hudgins, (o) In that case it was decided, that the existence of the indorser’s-name, upon the note, was no conclusive, evidence of ownership; and that is the only ground on which the appellee’s counsel, argued, contrary to the facts proved in the cause, that these notes may have been the property of the in-dorsers, or of some person other than the makers. Notwithstanding the existence of these names, on the notes, before us, the makers might, (upon the testimony,) have thrown them into the fire.
The difference, as to this particular, between an inchoate note standing under these circumstances, and a real bona fide note, of one man held and sold by another, is so clearly settled by adjudged cases, that I will now only proceed to cite them.
I will first rely on some cases decided in-the Supreme court of the State of New-York. They are equally entitled to credit, from the highly commercial character of' that State, and the ability of the judges, who decided them. I quote them, also, for the further reason, that they entirely accord with my opinion. These decisions depend upon the statute of usury of the State: of New-York, *which one of the counsel said he had examined, and found' to be, substantially, the same with our act.
In the case of Mun v. the Commission company, &c. (p) it was decided, that the true test in cases upon bills and notes, was-whether the bill or note was perfected, before it was discounted at usurious interest: that as it is settled, that a bill or note which is free from usury, in its concoction, may be sold at an usurious discount, for that as. it was free from usury between the original, parties, no after transaction can, as to these parties, invalidate it; so, it is equally clear,, that if a bill or note which is made for the-purpose of raising money on it, is discounted at an usurious rate of interest, and where none of the parties whose names are on it, can, when it becomes mature, bring a suit upon it, provided it had not been discounted, in that case such discounting would be usurious, and the bill void: and that if a bill or note in which the indorser has no interest, but merely lent his name for accommodation, ' is discounted at an usurious rate of interest, the purchase thereof is void, because until the time of the purchase, it remained a mere blank piece of paper. This is, precisely, the predicament of the notes before us.
In the case of Bennet v. Smith, (q) the principle of the foregoing decision is entirely recognised and ratified; because a note made for the purpose of being discounted, at a usurious rate, and indorsed for the accommodation of the maker, was void in its original formation, and it was held that it was quite immaterial whether the purchaser knew of the manner in which the notes were made or not. I infer, therefore, that it is the criterion before mentioned, and not his knowledge, which decides the fate of the transaction.
In the case of Jones v. Hake (r) where A. made his note payable to B.; which *821 was indorsed by him, and C. *and D., and sent by A. to a broker to raise money upon, and E. bought it at an usurious rate of discount, in an action by G. this note was held to be usurious and void. It was held by the court, that this note was indorsed for the accommodation of A. alone; that no money was paid therefor by any of the indorsers; that it was a contract between A. by his agent, (the broker,) and E. who lent the money, and took the note as his security; that the lender E. was in reality the first holder of the note, for value, or who could sue upon it; and that this pretended sale was, therefore, a shift to evade the provisions of the statute.
This case seems entirely in point with the case before us. I am unable to discover even a scintilla of difference between them.
Again; in the case of Wilkie v. Roosevelt (s) where A. made his note to B., who indorsed it for the accommodation of A. and A. passed it by means of a broker to C., at an usurious rate of discount, it was held, that although the note was indorsed by B. for the accommodation of A., it passed immediately from A. to C., and that the transaction was in its inception usurious, and the note consequently void. It was further held thatB. was merely a collateral security for the accommodation of A., that he, B. paid no consideration for it, but that it passed to the broker to be discounted at an usurious rate of interest, and when discounted, it passed immediately from A. to the purchaser. It was so held, I presume, on the further principle, that a note which is in possession of a man’s agent is still in his possession. This case is also full up to the very point before us.
If gentlemen are more fond of cases from Westminster-Hall, than of these northern lights, as one of the counsel was pleased to term them, I will now endeavour to gratify them.
*In the case of Young v. Wright in court of K. B. in England, (t) where A. drew a bill of exchange on B., payable In three months, to his (A.’s) order, and A. indorsed it to C., who indorsed it to the plaintiff; and A. having put it into B.’s hands for whose accommodation it was drawn, . and D. swore that he was in the habit of discounting bills for B. at an usurious rate of discount, and had agreed to get it discounted at 40 per cent, for B., and that, on these terms, it was passed to B., it was held by Lord Sllenborough, that at the time the bill was drawn there was a corrupt agreement that it should be discounted at usurious interest, by which it was vitiated, into whose hands, soever, it should come.
In principle there is no difference between this case, and those first cited, or the case at bar. There is no difference between the •issue of a note which is preceded by an usurious agreement, and one whose emanation is coeval with such agreement, and forms a part of the usurious transaction.
In the case reported 1 Marshall’s Rep. 210, in the C. B. in England, it was held that as the object of the makers of the note was to accommodate the payee, he (the payee) could not have sued them. This accords with all the cases before cited, and with the aforesaid case of Norvel v. Hudg-ins. It shews that a note indorsed for accommodation is not such a complete and perfected note, as would avoid the objection-of the statute, under the distinction I have taken.
In full accordance with the foregoing decisions in both their branches are the opinions of the elementary writers upon the subject. Thus in Ord(u) it is held, that where a note is originally good, no usurious transaction between the intermediate parties can affect the title thereto in the hands of a bona fide holder; and again, (p. 100) it is held that a security which is originally valid, cannot be avoided by a subsequent usurious contract. So on the *other hand it is held (ib. p. 92) that a contract which is usurious in its inception cannot be afterwards rendered valid, in the hands of a bona fide indorsee, without notice. Every thing therefore, depends upon the perfection and consummation of the note, anterior to the usurious transaction.
I have said that although the appellee, in the case before us, had full knowledge of the usurious nature of the transaction, that knowlcge was entirely unimportant. The case of Acklan v. Pearce (v) entirely proves that position. In that case a bill of exchange was held void in the hands of a bona fide assignee, it being drawn in consequence of a usurious agreement, although the drawer to whose use it was made payable, was ignorant of such agreement, and the court held that if the bill must be valid because the parties to it cannot^be shewn to have had notice of the usurious agreement, it would afford an easy recipe, to evade the provisions of the statute. The same doctrine is entirely held in the case of Lowe v. Waller, (w)
Nothing now said by me conflicts, in the smallest degree, with the decision of this court in the case of Hansborough v. Baylor. I have the original record in that case, now before me. By that record It appears, to have been a fair and naked case, of a sale of bonds. Por any thing appearing in evidence, in that case, Rootes may have been, as Hansborough swears, he believed him to be, the bona fide owner of Baylor’s bonds. Rootes was a farmer, and not a broker, as Mertens was. He too assigned the bonds, which is generally done by the owner, and never by a broker; whereas Mertens did not assign the notes, in the case before us. Hansborough also swears (and his answer is corroborated by the testimony,) that he did not treat with Rootes, as the agent of Baylor. He denies that he treated with him for a loan, and asserted that his only object was to purchase the bonds; *and he expressly denied, that the transaction was a device, to elude the provisions of the act of usury. In all these important particulars, that case stands strongly contrasted with the case *822 before tis. In that case Hansborough swore to facts whcli could not have been sworn to, by the present appellee. It is not shewn in that case, that Rootes was not the owner of the bonds; that they passed to him without consideration; or that the transaction was in its origin invalid. In these points also the two cases entirely differ. _ It is true that Hansborough admits, that he was informed that Rootes was not the owner of the bonds, after the time of his purchase: but this information may have been erro.neous: and it is not established to be correct, by the testimony. That case, therefore, being one of a simple sale of bonds, as far as appears in evidence, decides nothing as to the case before us.
The single circumstance of there being an excess of the legal interest received in this case, determines the contract to be usurious, (x) Again, it is said, that intentionally taking more than six per cent, for the use of money, alone, makes the contract usurious, (ib. 88.) This doctrine is more emphatically shewn by the decision, that where more than six per centum is reserved, by the mistake of the scrivener, and contrary to the intention of the party, the contract is not held to be usurious, (ib. 59.) In such case the exception proves the rule. It shews that although there must be a corrupt intent in the contracter to constitute usury,(ib.) that intent is inferred, from the single fact, that more than legal interest is reserved. Such a reservation, to say the least, throws the labouring oar on the adverse party; it throws the onus probandi upon the appellee, in the case before us.
Although, therefore, the form of the transaction, in the case before us, is that of a sale of notes, and although in the case of 'the perfected notes of one man bona fide *held by another, they may be sold by him, at any rate of discount, when considered as a fair and insulated transaction, the latter is not the case in the present instance, and the .form of its transaction will not elude the provisions of this statute. We are told by Lord Mansfield in the aforesaid case of Lowe v. Waller, that the real question in cases of this kind, is, what is the substance of the transaction, and not what is its form and colour. He also tells us that where the substance of it is a borrowing and lending, at an usurious interest, the wit of man is not capable of taking the case out of the operation of the statute. We cannot “wink so hard” to borrow another expression from this great judge, as not to see that the substance of this case (now before us) was to borrow money at an usurious interest, or to use the language of the broker (Mertens) “to raise money by shaving paper.”
In the time of Lord Mansfield the most usual form of usury, in England, was by a pretended sale of goods, (y) the most usual form here is, perhaps, by a pretended sale of notes. Formerly we are told by the same judge (z) when one mode of usury which was most common was prohibited by a statute, it put the usurers upon other contriv-anees to. evade the statute, and he adds that experience has taught the legislature in England, in their modern acts upon this subject, not to specify and prohibit particular modes of usury, because that only led to evasion, but the better way was, to enact generally, that no shift or device should enable men to get more than six per cent, on a loan. The same idea is kept up in Ord (a) and he adds, the English legislature were on this ground induced to use the more general terms “directly” or “indirectly” to prohibit the practice of usury. The words of our act are equally general and comprehensive. It requires only the attention of the courts, to decide what *is the substance of the transaction, to look beyond the mere form and to further the policy of the legislature. The courts ought to test each case by its particular circumstances, under that general criterion which the legislature has deemed it best to establish, instead of detailing and prohibiting particular modes of usury.
Acting upon this principle, I cannot, for a moment, doubt, but that this case is, emphatically, within the statute. The substance of the transaction is, most clearly, that the appellee was to lend to H. & H. the money in question, for a considerable time, which they promised, (by means of the notes before us) to repay him with an usurious and an exorbitant interest. The furnishing the appellee with explicit evidence of his right, under the contract, cannot cleanse that contract of its impurity. We have undoubtedly gone far enough in sanctioning the sales of the consummated notes of others, bona fide held by the seller, at an usurious rate of discount. This, it must be confessed, is a sufficiently fruitful source of usury. I again beg it may be distinctly understood, that I do not now mean to touch that question. That question is not new, and, perhaps, may not be considered open. I will not, however, go further and permit a man to sell, not his own note, for a note pre-supposes a real payee, as. well as a drawer, but his own blank paper at an illegal rate of discount. I will not, by this means, disrobe the consideration on which it is granted, of its usurious taint, and repeal pro tanto the act of usury. If an infamous transaction is not merged and purified by giving a bond upon it, which, generally, in itself, supports a good consideration, far less is it, when only a note is given as an evidence of that contract. In all cases of bills or notes, their consideration must be shewn to be good, save only, in the case of bills of exchange, when they have passed into hands other than those of *the original parties thereto." (b) As to the appellee, he must shew that the consideration on which the notes in question were founded, was not liable to objection: the converse of this is however, shewn, on the part of the appellant. Under the form of selling a man’s own notes, I will not legalise a contract, whereby in substance, for 101. now received, he is to pay 201. at the end of six months; and that too, out of his own coffers. The proposition *823 is monstrous, and cannot for a moment be entertained, by those who disclaim the power to repeal an act of the legislature. There could be no objection to my granting my note for 201. for the 101. received as aforesaid, did not the grant carry with it, the right to receive the money; to receive more than the sum lent, with an interest at the rate of six per centum per annum. There would be no objection to the transfer, if it carried with it the paper and the paper only.
When I formerly gave an opinion in this case, I signified my willingness, in the spirit of accommodation to the other judges, to consent to an issue to try the question. That overture was not accepted by them, and I now, explicitly, withdraw it. I cannot now consent to such an issue; because it is proved to my conception, as clearly as human testimonj' can do it, that the transaction in question, both in its origin and consummation was founded in usury. It is equally clearly proved, that this was known to the appellee, the chief actor.and mover in the business: but it is wholly unimportant as aforesaid, whether he had that knowledge or not. My opinion therefore, is, to reverse the decree, and render one pursuant to the prayer of the bill. The appellee, in my judgment, should be made to disgorge his illegal and iniquitous gains, and receive only his principal money, which is secured to him by the express provisions of the statute. That, however, is not the opinion of the other judges. '::Their opnion is, that the decree dismissing the bill should be affirmed; and it is to be affirmed accordingly'.

(c) Tate v. Wellings, 531.

(d) 1 Bast. 94.

(e) Wilkie v. Roosevelt, 3 Johnston 306, ana Bay’s Rep.; Payne V. Tervant, 23.

(f) Tally v. May, 1 Bay’s Rep. 486.

(gr> 2 H. Black. 144.

Oi) Page 63.

(I) lb. 87.

(k) Ord 69, 74, 84.

(l) Ord 116.

) Dougr. Rep. 698; Smith v. liromley.

) Pag-e S90.

(o) i Mun. 496.

) 15 Johnson’s Rep. p. 54.

a) Ibid. p. 355.

) 2 Johnson’s Rep. p. 60.

(s) 3 Johnson, 66.

ft) l Camp. 140.

(u) P. 96.

(v) 1 Camp. 690.

(w) Doug-. 708.

(x) Ord 47.

(y) Doug. 710, Lowe v. Waller.

(z) Ibid.

(a) P. 68.

tt>) Chitty 16.